in this matter. With me at the council table is Lisa Shynard, who is my associate attorney in this matter. Moving along this morning from larvates to lizards, I think the most significant point of – and the starting point for my argument is that my client was acquitted of count one, and he was acquitted of count two, and he was acquitted Having said that, I think it's – since my client – since the government presented evidence that my client had stated in tape recordings that he had smuggled lizards in his leg, I think that at least the jury, I will say – go on by saying that I believe that – the jury believed that those statements were a funny story, and that – because if they believed that he was – that was actually true, then they would have convicted him. So you start with that point. But would it even be possible to smuggle – Pardon me? Would it even be possible to smuggle for iguanas in a prosthetic leg? Indeed, Your Honor, that's – you are correct. It would. But that evidence – the evidence of the fact that the size of his leg and how – what spaces there are or aren't, the court did not allow me to put that before the jury. But notwithstanding that, the jury acquitted him, so it's not part of this appeal. So then the question remains, once the jury acquits him, the question is, well, then where did the four lizards come from that were in his house when the search warrant was executed? And I think it – if he had been convicted of count one, I'd have a much bigger problem here today, because the government would simply argue they came from Fiji. Where else? Where he smuggled them, from which he smuggled them. So therefore – There still is evidence in the record that he went to Fiji. But, you know, for me, the hardest issue here is – has to do with the expert. And then also evaluating, you know, what would the expert have said relative to what your defense was, and how your client had the expert – and even assuming that it was error not to allow the expert to testify, why it's obviously prejudicial as opposed to harmless error, and what your client wasn't allowed to argue because the expert didn't testify. Because apparently, I guess, you know, there was an expert that testified that it was in-state offspring of the pre-act iguanas. So that – there is that expert testimony available. What would your expert have added to that that would be crucial to your defense? That was the – that's the government – the government expert or their informant testified that if your iguanas are born in the USA, as Bruce Springsteen says, then they're legal, and you can trade them, you can possess them, and so on and so forth. Mr. Blair was allowed to testify over my objection to the motion in limine, and I continue – I continue to object to that substantive testimony up to the point of his testimony enduring, that as far as he – and I'm summarizing – as far as he knows, based upon my years as a trader, and then I go to trade shows, I don't know anybody that possesses one here in Los Angeles. I don't personally. I don't personally know. I haven't personally. Right. Now, we objected to that. The Court overruled me, and so be it. So how do I counter that? I bring on the – I tried to bring on the curator of the L.A. County Zoo Reptile and Lizard House, who was the curator for 25 years, prepared to testify to facts that the jury was – were kept from the jury. Well, first right off, from the way you say that, I'm thinking, like, okay, if your expert could come in and say that he's personally seen that, that'd be great. I mean, that obviously has to – you know, that really – that's a home run for you. Right. And the judge seemed to focus on – he can't say that either, right? Well, yes, but let's go back to – I agree, but we didn't have that. What we had was an expert who will say, pre-Cites, in the early 80s, these lizards were popular. They were brought in as – they were available to be brought in as pets. They were on price lists during that time, and this is a time when he was the curator of the reptile zoo. So he was in a position to be aware of what's going on in the world of lizards and iguanas at the time. He was also prepared to testify, which I proffered, that these lizards, these Now, the – although I didn't proffer how long they live – I know how long they live, but I didn't proffer it, so I won't say it – there was testimony before the court that they had at least some iguanas that were seven years old at the time of the trial. So he would have been – putting all that together, the jury would have been able to infer that there is another reason why there are born-in-the-USA, second, third, fourth-generation lizards in California or in the U.S. They might be in private collections. And Mr. Blair doesn't know about. They might be hidden under rocks in someone's backyard, and they come out. He could – that was – that was the sole defense to the issue of where do these lizards come from. Mr. Blair – and it's interesting, because it's two different issues that are raised there. Well, what would he be saying that Mr. Blair – we know that the possibility exists that there could be – you know, that his iguanas could have been legal. What would your expert have said that the other one didn't say? My – my expert would have said that – Because he can't say he saw one like that. No, he can't. But Mr. Blair was able to say, I don't know of any, I didn't see one, and therefore, because I'm an expert, the inference – the sole inference from his testimony, otherwise it's irrelevant, is there are none here. And over my objection, the government was able to elicit that testimony from Mr. Velchey, who said, I've been trading lizards for so long, and I've never seen one here in California. I objected, moved to strike, the court overruled me. Mr. Blair testified – and again, I'm paraphrasing – I don't know of any, and I know everybody, and I don't know of any. So how do we counter that? Yes, the best testimony is to bring someone in who says, well, I saw one last week walking across the street. I didn't have that. But the second best is to bring in circumstantial evidence that they were here, they breathe, and there's no reason to – and they were here illegally. Well, or expert opinion. Pardon me? Or expert opinion, which is what you were trying to do. Opinion, but it goes beyond opinion, Your Honor. The case law cites not just to opinion testimony, but the court should have considered, even if he excluded an opinion that – of my expert saying, and therefore they must be here. Put that aside. The case law that I cited also, that's U.S. v. Rahm, says that the court must consider not just the expert's opinion, but even if he doesn't allow that, the court should consider whether the testimony of the expert would be beneficial to the trier of fact. Well, let me ask you this. Did – where in the record the people that testified for the prosecution, were they allowed to conclude, because I haven't seen them, they're not here? Were they allowed to confirm? Oh, no, that's – no, they weren't allowed to say that. Because that was – if they had been allowed to say that, I think you're home free, that you're – even though a court shouldn't allow someone to come to the legal conclusion that the jury is supposed to decide. Right. But had they said that, then you're certainly disadvantaged by – that your guys should be able to say, well, I think they are here. Right. Well, that's – the court didn't allow them to go to that ultimate issue. He said they can say that – everything else but that. But the logical inference from which the government was able to argue, or that was clear to the jury, is that they – if I don't know that they're here, then any lizard that's here must have been smuggled. There was no other evidence that my client actually smuggled any of the four iguanas that he had. By the way, the three of them, we presented photographic evidence that they were born in the USA. So only talking about one, her name is Lacy, and the government had to prove that my client knew that Lacy was smuggled. And the only evidence that they had was a circumstantial inference from Mr. Blair's testimony. And the jury should have had the – to be able to weigh the testimony of my expert, it goes to the weight of the evidence. When you say that was the only evidence, wasn't there other evidence about conduct of your client that, you know, where he – well, I don't want to get caught doing this, or – I mean, there was – you know, I'm kind of picky about when you say it's the only evidence. Right. All right. Let me address that, Your Honor. And I was hoping to hold five minutes at the end, but I'll address that question. The only other evidence that they cited in their papers and that was available is during the conversations, the taped conversations, my client said words to the effect, well, you know, there's a certain amount of risk holding these – holding Fiji-banded iguanas. And – but – and the other point is my client told Velchey after the search, hey, if you have any illegal animals, you should squirrel them away. That has to do with Velchey's conduct. My client referred during the course of his conduct to risk of having Fiji-banded iguanas, having smuggled them in. The jury had to have accepted those statements as just a storyline so he could get cheap lizards from Velchey. They had to have accepted that. Otherwise, they would have convicted him. So that's – the government's – that's the only other evidence. My client testified that he was – he had no reason to believe, and I'm paraphrasing, that Lacey had been smuggled into the United States. And that gets me to the other error, which the Court excluded, which is my client's prior statement. And it's really important. I ask – urge the Court to look at the government's excerpt of record, 202. Prior to the search warrants, in a tape-recorded call, my client was talking to Velchey about his knowledge of the lizards that he had, the iguanas, and he said, they're second generation. He described the lizards that he – who were the parents of the babies to be as they're bred here. They're bred here. What my client is saying is Lacey, according to his understanding, was bred here. That's what he testified. He had no reason to believe that they were – I'm sorry – smuggled in. But we had a prior consistent statement that should have come in. It was prior to any motive to lie. It directly connected to our theory of the case that he had no knowledge. Knowledge is the key. The Court excluded it without comment. That was not – it was – it was obviously abuse of his discretion. The error in this case is not harmless error. The Court also asked me about that because the government's case, once my client's acquitted of smuggling, now they are scrambling to come up with evidence to show that Lacey was smuggled, as opposed to being born in the USA. And they only have Blair. And my client was not allowed to put any evidence in to contradict Blair. And that's with Dr. Fisher. We have this report of investigation by Doreen James. Did that – where he was interviewing Blair, did that come in? No. The report of investigation about Blair did not come in, as I recall. And you didn't use that to impeach – I guess you couldn't because it was the report of a conversation. Right. I'm not sure. I don't recall having – I may not be understanding what the Court's saying. Okay. The – I'm just saying there's in the record a report of investigation where Blair explains to somebody that the animals would have to be grandfathered in prior to sites being enacted. The testimony was clear that unless – once an iguana is in the United States and has offspring, that the offspring – That's clear and both sides agree with that. Yes. There's no – there's no dispute. It was – the government's witnesses even testified to that. So – and that's – I think there was some confusion in the record about whether this mere possession of an iguana without a permit is illegal. Judge Real was confused on that point. And I direct the Court to ER 63, where he said that Blair testified that they were here without permits, and Blair never said the word permits, as I recall. I think that even in the government's brief, they say, My client stipulated that he – that he did not – that he possessed an iguana without a – without a permit. Well, that's not exactly what the – that's, again, it's confusion. It's not possession. My client stipulated that he did not import an iguana without – without a permit. So I – I know that this Court is very well aware of what the standards are for abuse of discretion, for what the standard is for harmless error. I know the courts are familiar with the cases we've cited, U.S. v. Rahm and U.S. v. Vallejo, which go through very distinct analysis of how – how the factors are involved. And whether it's – in the end, is it really a key point that's – that was excluded from the jury's consideration? And here it was the key point. It was the heart of my defense with respect to the iguanas that were here. Did my client have knowledge or not that they were brought in? Contrary to law. So I'm going to reserve the remainder of my argument. Thank you, counsel. May it please the Court. Rina Elamami on behalf of the United States. Before I begin my argument, I just want to point out to footnote 6 of the government's brief, which addresses the prior consistent statement that counsel referred to. In that conversation, when the defendant was speaking of second-generation iguanas, it was not – he was not speaking of the fact that these iguanas were born in the State of California. Contrary to that, the defendant in that same conversation references smuggling iguanas from Fiji, and the second-generation comment refers to the fact that these iguanas are second-generation of the iguanas that were smuggled from Fiji. With that, this appeal is – examines really whether the Court abused its discretion in three evidentiary rulings that the Court made during the course of the entire trial. And in order to put the Court's rulings, particularly with respect to the expert opinion. Experts is the one that concerns me the most. Yes, Your Honor. And I'm inclined to think that that was probably error. So the harmlessness or the prejudicial factor is one that I'm trying to really focus on what this expert would have said that would have supported his defense that was not already in the record. Yes, Your Honor. Respectfully, we would maintain that it was not abuse of discretion. However, I'll also explain the harmlessness of the ruling. Now, putting the expert rulings in the context of the evidence that was presented at trial, it's important to keep in mind five specific facts that were presented to the jury. First, it was without dispute that the defendant and his former wife visited an ecological park in Fiji where the defendant had access to Fiji Island-banded iguanas. With certainty, the defendant had these Fiji Island-banded iguanas in his residence after his trip to Fiji. However, during trial, the defendant could point to no individual that was aware of his possession of these. Wait a second. What we're looking at now is evidence that shows that the government proved beyond a reasonable doubt using other evidence. So the defendant doesn't have to do anything. What was the government, what did the government put in? Yes, Your Honor. Now, Your Honor, the government demonstrated in this case that even omitting the testimony of Mr. Blair, the jury heard evidence that the defendant himself believed that Fiji Island-banded iguanas were unavailable for sale or trade in the United States. And that is found at Government Expert Record 23. In a recorded conversation, the defendant told the informant that it was, quote, impossible to obtain a Fiji Island-banded iguana. And in recorded conversations with the jury heard over the course of the entire four years that this defendant was in contact with the informant, the defendant pointed to no source in which he was able to obtain Fiji Island-banded iguanas apart from Fiji. It was not until the search was executed at the defendant's house and the iguanas were seized that the defendant's story changed and he claimed that he received these endangered iguanas from an individual named Ryan who he could not identify, could not point to, and that was his story at that point. You know, counsel, I agree with Judge Callahan. That's obviously the biggest problem in this case because it was really the sole defense, and I would have less of a problem with it had the court not permitted Blair to testify that he had no personal knowledge. And then the district court himself misinterpreted that testimony, saying that Blair said he didn't know of anybody who had any iguanas without permits. So the government was allowed to create this inference that there was no such thing as, you know, grandfathered in iguanas, and that therefore James couldn't have had one of those. And then the defense was not able to put in a pretty well-renowned expert on the subject of reptiles in this case. Well, looking first at the defense's expert in this case, the defendant prior to trial had not submitted any witness statement summarizing his expert's qualifications. But what does that have to do with it? Well, before the Court, it was simply the oral proffer that defense counsel made regarding what the basis for Mr. Fisher's opinion would be. But we're not reviewing at this time whether they sandbagged you without, you know, on a discovery issue or something like that. If that were the case, we're looking at a completely different thing of keeping something out. And that's not my point. I apologize if I'm unclear. The point is, did the court abuse his discretion in knowing what he knew at that time in the middle of trial regarding what Mr. Fisher would testify to? And the fact of the matter was this. The defense counsel proffered that Mr. Fisher had expertise in the field of reptiles. He had read literature relating to Fiji Island banded iguanas. And that according to the proffer, Mr. Fisher would testify that in the 1980s, there were a number of dealers that were seeking their purchase or sale on Priceless, some suggesting that they had permits and some not. However, it was clear from the proffer that defense counsel made that Mr. Fisher was not personally aware of any individual personally selling or purchasing Fiji Island banded iguanas. But your witness got to testify, and your witness said the same thing. So why shouldn't their witness get to testify? And you could have cross-examined him. You could have said, all right, you're an expert. You, you know, ran the reptile house for 25 years. But do you have any personal knowledge? Since Fisher was asked that question, Blair could have been asked that question. Your Honor, the opinion that Mr. Fisher sought to offer was that at the time that the defendant possessed these Fiji Island banded iguanas, Fiji Island banded iguanas were readily available in private individuals' collections in the State of California. There was no basis for that opinion. Mr. Fisher had no personal knowledge that any individual privately owned Fiji Island banded iguanas in the 1980s. But just think, wouldn't that have been a perfect area of cross-examination for you? Your Honor, I agree. However, did the Court abuse its discretion in not allowing Mr. Fisher, who had no personal knowledge of privately owned Fiji Island banded iguanas in the 1980s, let alone 20 years later in 2000, 2001, and 2002, when it's argued that the defendant had these iguanas? The First Counsel admitted Mr. Fisher had no knowledge of any individuals now presently owning Fiji Island banded iguanas, nor in 2002, through the time period of the investigation, of any private individual having these Fiji Island banded iguanas. There was no evidence. Was there any evidence in the record, aside from Fisher, that iguanas were bought and sold and freely traded before 1980? Your Honor, while it's not in the government's excerpts of record, I do believe that Mr. Blair may have been cross-examined by defense counsel regarding this subject matter. However, in this case, Mr. Fisher's ---- Well, then, wouldn't you put it in your excerpts if that had been ---- Your Honor, I agree and apologize for that oversight. Well, does it exist or not? I do not have it with me, and so I cannot cite to it. You said, in answer to Judge Canby's question, you said, I do believe it may exist. That's not a yes or no.      It is. Does it exist or not? I do believe it may exist. I do not know that. If the Court would be interested in that information, I can provide the Court with a letter after the hearing. Your Honors, I believe that Mr. Fisher's ---- the Court's exclusion of Mr. Fisher's testimony is most analogous to the Seventh Circuit's case decision in the United States v. Klondoris, in which the Court found that when there's no factual basis for the evidence or for the opinion that the expert would seek to proffer, it is non-abusive discretion to omit that expert testimony. Here, it's clear that Mr. Fisher had no basis for the opinion that defense counsel was seeking to proffer him for. That is, that this defendant obtained fetal and banded iguanas from some individual in the State of California. Moreover ---- That wasn't the opinion he was going to want. He was going to say, my opinion, he obtained this from somebody. But he had no basis for that opinion. He had no ---- Well, it's not the opinion that he was going to testify to. Well, it's the inference that would have been drawn, and that is a good distinction, Your Honor. He would go so far as saying that he believed that these iguanas were available at the time the defendant had them in private collections. However, the proffer demonstrated that he had no basis for that opinion. In comparison, the government's expert merely testified to the fact that, based on his experience and his experience alone, he had not seen these iguanas available for trade in the State of California. The government's expert was not the single piece of evidence that the government was relying on regarding availability of Fiji Island banded iguanas in the State of California. It was consistent with the informant's testimony. It was consistent with the defendant's recorded statements. And it was consistent with the fact that even in this case, the defense counsel's proffer would indicate that Mr. Fisher would not testify differently. This case is distinguishable from United States v. Morales, that the defendant relies on in this case, for two reasons. First, in United States v. Morales, the expert's qualifications and experience in that case would permit him to render the opinion regarding the defendant's, in that case, bookkeeping skills. And secondly, in that case, the defendant's expert would have corroborated the defendant's defense in that case. In this case, Mr. Fisher would have testified that, contrary to the defendant's defense, he was unaware, personally, of any Fiji Island banded iguanas in the State of California or elsewhere in the United States. The garrison ---- Was he going to testify to any other possible ways that they could exist, possible ways that they could exist that your expert didn't testify to? Based on the proffer that was given by defense counsel, I do not believe that that's the case. No, he was not. But what about ---- I mean, I'm really curious now that what you're saying as to what your expert on cross-examination, whether, you know, that created a window for the defense to argue what they're claiming they needed to argue, whether that exists or not. Your Honor, without that record in front of me, I cannot, and I will not speculate particularly what testimony was elicited from Mr. Blair on cross-examination. However, in this case, I think it's clear that there was a sound basis for Mr. Blair's testimony. The Court was well aware of his qualifications and properly limited his testimony to simply what he observed in his experience. It did not preclude the defendant from arguing that just because Mr. Blair did not see these iguanas does not mean that they do not exist. May I ask you what was the government's evidence that these iguanas were in the United States unlawfully? Your Honor, several things. One, the defendant's own statements to the confidential government informant, particularly his inferences regarding getting, quote, having them, to the fact that the defendant made statements that he had not gotten them from, for four years to the confidential informant, that he had gotten them from Fiji and that there was no other place to get them but Fiji. He would have to travel back to Fiji in order to get them. And then it would be the informant's testimony that as a rare reptile dealer at Government Excerpt Record 24, this informant had not seen any private individual lawfully or unlawfully own a Fiji Island banded iguana apart from the defendant. The defendant on cross-examination could point to no individual that was aware of his possessing these Fiji Island banded iguanas prior to his trip to Fiji.  Defendant's former wife testified. She did not identify that she was aware that he had these Fiji Island banded iguanas prior to his trip to Fiji. Even excluding the testimony of Mr. Blair in this case, there was ample evidence that was presented to the jury, including the defendant's trip to Fiji, his access to the Fiji Island banded iguanas, and his repeated statements throughout the course of the four-year investigation, even excluding the government's expert testimony, that would support his conviction in this case. The government maintains that... But did the government have to prove that, in fact, the iguanas were in the United States contrary to law? That's correct, Your Honor. Okay. So you said many, many pieces of evidence, but they're all really the same thing. It's the defendant's belief. What was the evidence that, in fact, the iguanas were here contrary to law? Well, the parties stipulated that this defendant had no permit to export them. The permit, there's evidence in the record that you don't need a permit if they're That's correct, Your Honor. However, in this case, no individual could point to any private individual in the United States, let alone in the state of California, that had access to these iguanas. And on cross-examination... Would the defendant's expert have testified to all of the ways that they could be here legally? You know, what ways they could somehow, whether it be grandfathered or any of... Would the defendant's expert have testified to anything different on that point? According to the proffer that was before the court, the defendant's expert would testify that they were popular pets and that they were available to breed in the United States and in the state of California. It was unclear where he obtained that knowledge from. It was clear that he had no personal knowledge of any individual having these iguanas privately. So that's more than your expert said. Your expert didn't say that, right? No, my expert did not say that. However, a jury could reasonably infer that iguanas do breed amongst themselves. And defendant was not precluded from making any argument to the jury that these iguanas existed in the country prior to CITES or offspring of them. In fact, there was testimony before the jury that these iguanas were breeding in the defendant's house. And so the jury was free to assume or infer that these were offspring of legally owned iguanas. However, the evidence, the significance of the evidence, the weight of the evidence, weighed in favor of a guilty conviction. All right. We think we understand your position. Thank you. I have scant little time. I'll make the best use of it that I can. I'd like to clarify a couple things the counsel said first. Well, you don't have to talk fast. We'll give you a couple minutes. We gave the government a couple minutes. Thank you. First, we presented all of Blair's testimony in our supplemental excerpt of record. We just looked again quickly. We looked again quickly. Blair did not make any statement whatsoever about the legal pre-CITES existence of iguanas in the State of California. Now, did your offer of proof? In my offer of proof, I said that my expert would testify that the iguanas were legal to be owned, they were unpriceless in the early pre-CITES, and that they were legally – that's the testimony. Even if the Court excluded him testifying to the opinion that, therefore, they live for years and years and they're likely to be everywhere or in private collections, even if the Court excluded that opinion, he should have let the testimony in and allowed me to argue to the jury, all right, Mr. Blair says that he's not aware of any, but they were here in the 80s and they breed and they're – and you know the lifespan is at least seven years because Jerry's are seven years – Lacy is seven years old. Therefore, ladies and gentlemen, the – you can weigh as to whether there's another source for the Jeremy James Lacy iguana. And by the way, again, I want to clarify something that counsel got wrong. At page – Government's Excerpt of Record 202, this is the pre-search warrant, tape-recorded conversation that was excluded. My client said to the informant there, referring to Lacy and the – and Lacy's parent at the time – I mean, Lacy's spouse, who was subsequently deceased, they are bred here. Here meaning in the United States. So this was a pre-search warrant statement without any motive to lie, and that's what – But it appears that a complete reading of the transcript shows that he was referring only to the progeny of Houdini and Blanca. I believe, Your Honor, that the testimony is that he was referring to the – to the progeny of Lacy and her spouse, whose name escapes me, and that they – because they had children by – at that point in time. So – I think if you read the whole thing, it – he appears to be referring to Houdini and Blanca. All right. I – Your Honor, I'll leave it to you. It's – To make that determination. All right. To make that determination. If it was Houdini and Blanca, the Court was right. If it was Lacy, then you're right. Yes. With respect to that. But that was only one of the errors that were made by the Court. The other thing is, I'd like to say that the only person who was available to testify as to the presence of Iguanas in the State of California testimony, which I thought should not have been allowed anyway, was – was Fisher. He had the – he had the qualifications, he had the expertise, and he was not allowed to do so. Another one I want to really make sure I clarify is that we did – we didn't sandbag the government. We presented to the government our – the CV, a short summary of what he was going to be presented – what he was going to be testifying to. We presented that to the government in the exchange of discovery. It's – I know that we did not – Were you both trial counsel? Pardon me? Were both of you trial counsel? I was, and counsel was as well. So – but it was not – so if there was an inference that we sandbagged the government, that's not correct. We did – my proffer to the Court was oral. That is a correct statement. And the – I guess the final point I want to make is that counsel talks about the evidence, that my client's statements were the evidence that Lacy was smuggled. But I come back to one of the original points I made. Yes, my client said on tape, I smuggled these in my leg from Fiji. That's how they got here. If the jury believed that, then he would have been convicted of count one, of smuggling. The jury clearly did not believe that those statements that he made on tape were true. So therefore, I respectfully suggest that the jury discounted the puffing, incriminating statements he made on the tape. They accepted that he was doing those just to get cheap lizards from the informant and keep the story – and it was a story, but it was not the evidence. And that's why they acquitted him of count one. So I don't think the government can turn around and say, well, yes, but there continues to be evidence that he smuggled or that he was aware that they were smuggled because it's just a story and it's just that. This is not your typical case where – which I've been involved in where protected animals or animal parts or skins are brought to the United States for sale. He – my client testified that he possessed these animals, these lizards, as pets, that he – indeed, he reproduced them, and he repeatedly refused to sell them to the informant who was offering him lots of money for them. This is – this case, in the end, it was not fair. It was fundamentally flawed by the errors that we've tried to present to this Court. And all we ask is an even playing field and a fair fight, and then – and that's why I'm asking this Court to remand. All right. Thank you, counsel. United States v. James will be submitted, and we're going to take about a five-to-10-minute recess at this point. Thank you very much for the argument. Thank you. All rise. This Court is adjourned at a 10-minute recess.
judges: Canby, Wardlaw, Callahan